Filed 8/17/21

**CERTIFIED FOR PARTIAL PUBLICATION**<sup>*</sup>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| LOS ANGELES DEPARTMENT OF WATER AND POWER,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>COUNTY OF INYO et al.,<br><br>    Defendants and Appellants. | F081389<br><br>(Super. Ct. No. BCV-18-101513-KCT)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County. Kenneth C. Twisselman III, Judge.

Jarvis, Fay & Gibson, Rick W. Jarvis, Christine L. Crowl; Greg James; Marshall S. Rudolph, County Counsel, John-Carl Vallejo, Assistant County Counsel, and Grace Chuchla, Deputy County Counsel, for Defendants and Appellants.

Arthur J. Wylene and John Kennedy for Rural County Representatives of California and Rural Counties' Environmental Services Joint Powers Authority as Amici Curiae on behalf of Defendants and Appellants.

---

<sup>*</sup>    Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II., III.B., and III.C., of the Discussion.

Jennifer B. Henning for California State Association of Counties as Amicus Curiae on behalf of Defendants and Appellants.

Michael N. Feuer, Joseph A. Brajevich, Julie C. Riley, Melanie A. Tory; Downey Brand, Christian L. Marsh and Kathryn L. Oehlschlager for Plaintiff and Respondent.

-ooOoo-

The County of Inyo (County) appeals from a judgment and issuance of a peremptory writ of mandate in a proceeding under the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.).[1] The trial court issued the writ of mandate after determining (1) County's description of the activity constituting its project was too narrow and, thus, did not comply with CEQA and (2) the project, when properly defined, was not exempt from CEQA's requirements. The project includes County's use of condemnation proceedings to acquire fee simple title to three sites it leases and uses for landfills and County's continued operation of the landfills. In arguing that the project was exempt from CEQA, County relied on the commonsense exemption and the existing facilities exemption. (See Guidelines, §§ 15061, subd. (b)(3) [commonsense exemption], 15301, subd. (a) [existing facilities exemption].)

The published portions of this opinion address exhaustion of administrative remedies and the interpretation of the existing facilities exemption. The exhaustion question requires an interpretation of section 21177, subdivision (a) and the limitation contained in section 21177, subdivision (e). We conclude the issue exhaustion requirement does not apply to challenges to the exemptions because County did not provide adequate notice that CEQA exemptions would be considered at the public hearing held by its Board of Supervisors. As a result of the lack of notice, County did not provide an "opportunity for members of the public to raise … objections" to its reliance

---

[1] All unlabeled statutory references are to the Public Resources Code. "Guidelines" refers to the CEQA regulations set forth in California Code of Regulations, title 14, section 15000 et seq.

2.

on those exemptions. (§ 21177, subd. (e).) Therefore, the issue exhaustion requirement does not apply to objections to County's reliance on the exemptions.

Our interpretation of the existing facilities exemption addresses whether the word "facilities" is ambiguous with respect to its application to an unlined landfill. Like the court in *Azusa Land Reclamation Co. v. Main San Gabriel Basin Watermaster* (1997) 52 Cal.App.4th 1165 (*Azusa*), we conclude "facilities" is ambiguous—that is, reasonably susceptible to more than one interpretation—because it could be interpreted to include or exclude unlined landfills. (*Id*. at p. 1192.) We resolve the ambiguity by interpreting "facilities" to exclude unlined landfills. Therefore, County misinterpreted the Guidelines and violated CEQA when it concluded the existing facilities exemption applied to the project.

In the unpublished portions of this opinion, we conclude County committed two other CEQA violations. First, it improperly described the project as constituting only the proposed condemnation proceedings and a mere change in ownership of the landfill sites. Second, the unduly narrow project description caused County to erroneously conclude the commonsense exemption applied. The CEQA violations justified the trial court's issuance of a writ of mandate vacating County's approval of condemnation proceedings for each of the three landfills.

We therefore affirm the judgment.

## FACTS

*The Landfills*

The City of Los Angeles, acting through its Department of Water and Power (LADWP), states that it is the largest landowner in Inyo County after the federal government.[2] In the 1950's, LADWP began leasing land to County for waste management purposes. This litigation involves landfills operated by County on three

---

[2]     See Chinatown (Paramount Pictures 1974).

sites leased from LADWP. The landfills are known as the Bishop-Sunland Landfill, the Independence Landfill, and the Lone Pine Landfill.

The Bishop-Sunland Landfill is located on a 120-acre site about two miles southwest of Bishop, west of Highway 395. It was established in 1955 and serves Bishop and the surrounding unincorporated communities. Its disposal footprint is entirely unlined and covers about 78 acres. The site is located on a gently sloping alluvial fan elevated about 130 feet above the Owens Valley floor.

The Independence Landfill is located on a 90-acre site south of Independence, east of Highway 395. It was established in 1965 and has a disposal footprint of about 18 acres. The unlined site is on a gently sloping alluvial fan elevated about 160 feet above the floor of the Owens Valley.

The Lone Pine Landfill is located on approximately 60 acres southeast of the unincorporated community of Lone Pine, a mile east of Highway 395. It was established in 1965 and its disposal footprint is about 26.6 acres. The unlined site is on a shallow alluvial fan at the western edge of the Owens River floodplain, elevated approximately 65 feet above the river.

*Regulation and Permits*

The landfills are operated by Inyo County Recycling and Waste Management. The operations are subject to oversight and permits from (1) the Inyo County Department of Environmental Health Services; (2) the California Department of Resources Recycling and Recovery (CalRecycle); (3) the Regional Water Quality Control Board for the Lahontan Region (Lahontan Water Board); and (4) the Great Basin Unified Air Pollution Control District (Great Basin Air District).

CalRecycle is the principal permitting authority and has issued a "Solid Waste Facility Permit" for each landfill (Operating Permit). The Operating Permits address hours of operation; the type and daily maximum tonnage of waste; maximum daily vehicle traffic; the landfill's area, design capacity, maximum elevation, maximum depth;

4.

and the estimated closure year.  Section 44015 requires permits "be reviewed and, if necessary, revised at least once every five years."  The operator of a permitted landfill cannot modify its design or operation in a manner not authorized by the existing permit without obtaining a revised permit.  (§ 44004, subds. (a), (b).)  The statutory procedures for obtaining a revised permit require at least one public hearing and an agency determination of whether, before making a decision on the application, review under CEQA is necessary.  (§ 44004, subds. (d)(5), (h)(1)(A).)

The Inyo County Department of Environmental Health Services, as CalRecycle's local enforcement agency, conducts monthly inspections and takes other action to oversee County's compliance with the Operating Permits.  (§§ 40130 [enforcement agency], 43218 [monthly inspections].)  CalRecycle also inspects the landfills periodically.

Prior to the August 2017 actions of the Inyo County Board of Supervisors that are challenged in this litigation, the landfills were subject to Operating Permits issued in 1999 and 2000.  In September 2017, the Inyo County Department of Environmental Health Services approved a revised operating permit for the Bishop-Sunland Landfill.

The Porter-Cologne Water Quality Control Act (Wat. Code, § 13000 et seq.) requires each regional board to review and classify operating waste disposal sites within its region.  (Wat. Code, § 13226.)  The Lahontan Water Board issued waste discharge permits for the Independence and Lone Pine Landfills in 1996 and for the Bishop-Sunland Landfill in 2001.

The Great Basin Air District issued County permits to operate for (1) a landfill gas collection and treatment system at the Bishop-Sunland Landfill and (2) a grinder at the same landfill.  The permits include monthly monitoring, periodic unannounced site inspections, and annual renewal.

*Prior CEQA Review*

In 1999, County's Department of Environmental Health Services prepared and adopted a mitigated negative declaration for each landfill in connection with its

5.

application for updated operating permits. Each mitigated negative declaration concluded that the operation of the landfill, with implementation of the recommended mitigation measures, would not result in a significant environmental effect and, thus, County was not required to prepare an environmental impact report (EIR) for that landfill.

In 2012, a four-page addendum to the landfills' three mitigated negative declarations was prepared (2012 Addendum). The 2012 Addendum addressed proposed amendments to the Operating Permits for the landfills. The amendments included (1) increasing the maximum daily disposal tonnage, (2) increasing the average daily tons, (3) slightly reducing the total acres in the disposal footprints to reflect updated surveys, and (4) changing the estimated closure dates. The 2012 Addendum stated the proposed amendments were consistent with the previous mitigated negative declarations and related to minor technical changes better reflecting existing landfill operations, new regulatory procedures, and improved measurement techniques. The 2012 Addendum concluded: "No additional impacts are anticipated not already considered, and no further mitigation measures are required." It also concluded no subsequent environmental document was required and it was adequate to comply with CEQA. The permit amendments under consideration in 2012 were abandoned.

*Revisions to Permits*

In 2015, County prepared another set of applications for revisions of the Operating Permits. To illustrate the changes—which LADWP characterizes as substantial and County regards as minor—the application for the Bishop-Sunland Landfill sought to increase peak daily tonnage from 120 to 160 (a 33% increase); increase average daily tonnage from 52 to 64.7 (about a 25% increase); increase capacity from approximately 4 million cubic yards to slightly over 6 million cubic yards (about a 50% increase); and accelerate the closure date from 2097 to 2064. Using 2015 as the baseline, the useful life of the landfill would shrink from 82 years to 49 years, a decrease of roughly 40 percent.

6.

In February 2017, County submitted an updated application for the Bishop-Sunland Landfill that sought similar changes. To comply with CEQA for the proposed revisions to the landfill's Operating Permit, County relied upon the 1999 mitigated negative declaration and the 2012 Addendum. In a May 2017 letter, the Inyo County Department of Environmental Health Services advised CalRecycle that, as the local enforcement agency, it "made the finding that the proposed permit is consistent with current CEQA documentation. An addendum to the Mitigated Negative Declaration (State Clearinghouse No. 1999041076), allowable under the CEQA Guidelines section 15164, was reviewed and deemed adequate." In September 2017, the Inyo County Department of Environmental Health Services approved the application for revisions of the Bishop-Sunland Landfill's Operating Permit.

*Condemnation Proceedings*

On July 17, 2017, County sent LADWP notice of its intention to adopt a resolution of necessity for acquisition by eminent domain of the landfill sites. In an agenda request form for the August 15, 2017 meeting of County's Board of Supervisors, County's staff described the 2016 negotiations with LADWP for the renewal of the lease on the Bishop-Sunland Landfill, which included LADWP's request for a fourfold rent increase to over $20,000 per year and a termination clause that would allow LADWP to terminate the lease for any reason upon 180 days' notice. These demands and the future negotiations for the other landfills caused County's staff to "call into question the County's ability to ensure long-term waste management services." Staff also described certain hardships that being a lessee created:

> "The terms of the current Bishop lease hinder[] the County's ability to effectively interact with state agencies having regulatory authority over landfill operations. The Bishop lease requires LADWP's approval for all interactions with those regulatory agencies. LADWP interjects itself into the regulatory process at every level, requiring approval before submission and review of work as it progresses, and LADWP reserves the right to ultimately block or revise any action the County wishes to take including

7.

actions necessary to comply with state regulators. As a result, there are delays and uncertainty with respect to all regulatory agency approvals."

Staff also set forth concerns about the amount of resources being used to negotiate three-year lease terms and the possibility of more restrictive terms in the future. In addition, staff stated:

> "The terms of the current Bishop-Sunland lease also thwart[] any potential cooperative efforts with neighboring counties or municipalities as it prohibits the acceptance of any waste from outside of Inyo County including Mono County or Mammoth Lakes."

Staff described the proposal to acquire fee title to the properties containing the landfills and stated County had begun negotiations with LADWP and made offers of just compensation based on appraisals of the fair market value of the property rights. Those offers had not been accepted and staff recommended using eminent domain to acquire the properties through condemnation.

LADWP notes several subjects were not addressed in the agenda request form published before the Board of Supervisors' meeting. It did not mention the mitigated negative declarations for the landfills' Operating Permits, the 2012 Addendum, any other environmental analysis, or how CEQA applied to the proposal. Before the Board of Supervisors' meeting, counsel for LADWP sent County a nine-page letter objecting to the proposed resolutions of necessity.

LADWP's letter asserted County did not need fee simple ownership for its proposed continued operation of the landfills and there was no public necessity for County to acquire ownership of appurtenant water rights. The letter also asserted "County has historically been lax in its landfill operations and, if left unchecked, its operations will likely pose a significant threat to the Owens Valley watershed and groundwater that supplies the Owens River and the Los Angeles Aqueduct." The letter listed a variety of regulatory violations that had occurred or were occurring at the landfills. Those violations and the remedial action taken need not be described here.

Page seven of LADWP's letter contained four paragraphs supporting LADWP's assertion that compliance with CEQA was mandatory before County could condemn the properties. On the fundamental CEQA issue of identifying the activity constituting the project, LADWP argued the project was not adequately described and, as a result, the potential environmental effects of the project could not be adequately evaluated. LADWP referred to the illegal use of the Bishop-Sunland Landfill as a site for concrete crushing, an activity that created additional truck traffic and dust. LADWP closed the CEQA section of the letter by stating:

> "Inyo County has stated that it already has plans to increase tonnage, expand uses, and correct violations at the Landfill Properties. The impacts of these changes in operations must be analyzed before Inyo County can acquire the properties. If Inyo County knows the changes that it will be making to the Landfill Properties and its operations, it cannot piecemeal the projects and delay CEQA review."

At the August 15, 2017 public hearing of the Board of Supervisors, counsel for LADWP appeared and reiterated its objections. Just before the close of the public portion of the meeting, a County staff member addressed the CEQA issue by stating County believed the proposed condemnation was exempt from CEQA on at least two grounds, including the categorical exemption for ongoing operations at existing facilities and the commonsense exemption. He described the project as the condemnation itself and not as entailing the creation of a new land use. This appears to be the first time County disclosed to the public that it might rely on CEQA exemptions.

*Resolutions of Necessity*

The Board of Supervisors unanimously adopted separate resolutions of necessity authorizing the condemnation of the three landfill sites for continued landfill purposes. The resolutions stated County "intends to continue the use and operation of a landfill, a public use, on [the three sites] and, in connection therewith, acquire interests in certain real property (the 'Project')." The Board of Supervisors explicitly found (1) "[p]ublic

interest and necessity require the proposed Project"; (2) "[t]he Project is planned and located in the manner that will be most compatible with the greatest public good and the least private injury"; (3) "[t]he property sought to be acquired is necessary for the Project"; (4) "[t]he offer of compensation required by Section 7267.2 of the Government Code has been made to the owner or owners of record"; and (5) "[i]nsofar as any of the property … has heretofore been dedicated to a public use, the acquisition and use of such property by the County for the purposes identified herein is for a more necessary public use than the use to which the property has already been appropriated."[3]  The Board of Supervisors authorized County Counsel to prepare and prosecute such eminent domain proceedings as necessary for the acquisition of the properties.

Like the agenda request form for the August 2017 public hearing, the Board of Supervisors' resolutions made no mention of CEQA.  Although the resolutions defined and used the term " 'Project,' " they did not state that definition applied *for purposes of CEQA*, did not explicitly determine the scope of the project for purposes of CEQA, did not set forth any finding relating to CEQA compliance, did not address any CEQA exemptions, and did not address the unusual circumstances exception to the exemptions.

After adoption of the resolutions, County did not file a notice of exemption, which would have triggered a 35-day limitations period.  (§ 21167, subd. (d); see Guidelines, § 15062, subd. (d) [35-day and 180-day statutes of limitation].)  As a result, any action or proceeding alleging noncompliance with CEQA was required to be commenced within 180 days from the date of County's decision to carry out the project.  (§ 21167, subds. (a), (d).)  Had a notice of exemption been completed and filed, it would have given

---

**3**      Because the "property" to be condemned includes both the land and appurtenant water rights, LADWP asserts, in effect, that the phrase "acquisition *and use* of such property by the County" indicates County will use the water rights being condemned.  A contrary interpretation (i.e., the water right will not be used), in LADWP's view, would mean there is no necessity for acquiring the water rights and, as a result, the resolutions contain falsehoods.

10.

County an opportunity to define the scope of the project for purposes of CEQA and to explain the application of the exemptions.

## PROCEEDINGS

In February 2018, LADWP filed a petition for writ of mandate in Inyo County Superior Court. The petition alleged County failed to properly identify the true nature and scope of the "project," as that term is used in CEQA. It also alleged County improperly determined its approvals of the three resolutions of necessity were categorically exempt from CEQA. In May 2018, the case was transferred to Kern County Superior Court.

In February 2020, after discovery and briefing, a hearing was held on the CEQA petition. After hearing argument, the court confirmed its tentative ruling to grant a writ of mandate directing County to set aside and rescind the three resolutions of necessity based on a failure to comply with CEQA.

In May 2020, the trial court entered a judgment and issued a peremptory writ of mandate. The writ directed County to set aside the resolutions of necessity and file a return to the writ within 120 days specifying the actions taken to comply with the writ. County timely appealed.

## DISCUSSION

The threshold procedural issue in this appeal is whether some of the CEQA violations must not be considered because LADWP failed to exhaust its administrative remedies before filing a lawsuit. We address the exhaustion question before reaching the substantive issues about properly defining the scope of the project, interpreting the existing facilities exemption, and applying the commonsense exemption to the properly defined project.

11.

I.     EXHAUSTION OF ADMINISTRATIVE REMEDIES

County contends LADWP failed to exhaust available administrative remedies because LADWP did not specifically raise some of the alleged CEQA violations and other CEQA theories during County's administrative proceedings. In County's view, this failure deprived the trial court and this court of jurisdiction over those allegations and theories. As explained below, we reject County's interpretation and application of CEQA's exhaustion requirement. (See *Sierra Club v. City of Orange* (2008) 163 Cal.App.4th 523, 536 [appellate court uses a de novo standard of review when determining whether exhaustion requirement applies].)

A.     <u>Statutory Provisions</u>

CEQA explicitly addresses the exhaustion of administrative remedies, containing both an *issue* exhaustion requirement and a *party* exhaustion requirement. This appeal concerns only issue exhaustion, which is addressed in section 21177, subdivision (a):

> "An action or proceeding shall not be brought … unless the alleged grounds for noncompliance with [CEQA] were presented to the public agency orally or in writing by any person during the public comment period provided by [CEQA] or prior to the close of the public hearing on the project before the issuance of the notice of determination."

The application of this exhaustion requirement is limited by section 21177, subdivision (e), which states:

> "This section does not apply to any alleged grounds for noncompliance with [CEQA] for which there was no public hearing or other opportunity for members of the public to raise those objections orally or in writing before to the approval of the project, or if the public agency failed to give the notice required by law."

In *Tomlinson v. County of Alameda* (2012) 54 Cal.4th 281 (*Tomlinson*), our Supreme Court considered the language in subdivisions (a) and (e) of section 21177, and concluded the issue exhaustion provision applied only when there was "(1) a public comment period provided by CEQA … or (2) an opportunity for public comment at public hearings before issuance of a notice of determination." (*Tomlinson*, *supra*, at p.

289.)  Based on this initial conclusion, the Supreme Court rejected a broad rule that the exhaustion requirement in section 21177 never applies to a public agency's decision that a project is categorically exempt from compliance with CEQA.  (*Tomlinson*, *supra*, at p. 289.)

Addressing the public-comment-period prong of section 21177, subdivision (a), the court stated that "CEQA does not provide for a public comment period preceding an agency's exemption determination."  (*Tomlinson*, *supra*, 54 Cal.4th at p. 289.)  As a result, the first prong does not make the issue exhaustion requirement applicable to a public agency's exemption determination.  Consequently, for purposes of this appeal, the issue exhaustion requirement will apply to LADWP only if, as required by the second prong, there was "an opportunity for public comment at public hearings before issuance of a notice of determination."  (*Tomlinson*, *supra*, at p. 289.)

Not every public hearing constitutes an "opportunity" for members of the public to raise a particular objection—that is, raise "alleged grounds for noncompliance with [CEQA]" as that phrase is used in section 21177, subdivision (e).  Consistent with basic principles of due process, the notice given before a public hearing has a role in defining the opportunity provided to the public.  (See *Mathews v. Eldridge* (1976) 424 U.S. 319, 333 [the essence of due process is notice and the opportunity to be heard at a meaningful time and in a meaningful manner].)

The Supreme Court addressed the relationship between notice and an opportunity for public comment at a hearing and concluded "that the exhaustion-of-administrative-remedies requirement set forth in subdivision (a) of section 21177 applies to a public agency's decision that a proposed project is categorically exempt from CEQA compliance *as long as the public agency gives notice of the ground for its exemption determination*, and that determination is preceded by public hearings at which members of the public had the opportunity to raise any concerns or objections to the proposed project."  (*Tomlinson*, *supra*, 54 Cal.4th at p. 291, italics added; see *Hines v. California*

13.

*Coastal Com.* (2010) 186 Cal.App.4th 830, 854 [issue exhaustion provision applies when there is ample notice of public hearing].)

Whether CEQA's exhaustion requirements apply to a public agency's exemption determinations is addressed in a practice guide that states "the critical factor is whether a hearing or opportunity to raise objections is provided. [Citation.] Thus, when no opportunity to express objections to a claimed exemption is provided by the agency, the exhaustion requirement does not apply. [Citations.] When an agency holds a hearing *but does not provide adequate notice that a CEQA exemption will be considered*, the requirement to exhaust remedies on the CEQA claim does not apply." (2 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar. 2d ed. 2020) § 23.105, pp. 23-121 to 23-122, italics added.) The practice guide cited *Defend Our Waterfront v. State Lands Com.* (2015) 240 Cal.App.4th 570 (*Defend Our Waterfront*) as support. In that case, the agenda for the meeting "did not notify anyone that [the lead agency] would also consider invoking a statutory exemption to CEQA." (*Id.* at pp. 583–584.)

B.      Lack of Adequate Notice

LADWP contends County did not provide notice of its grounds for CEQA compliance before the hearing and, therefore, those grounds can be challenged in a lawsuit without complying with the exhaustion requirement. In response, County does not argue its notice adequately apprised the public of the CEQA issues that would be addressed at the hearing. Instead, County argues subdivision (e) of section 21177 does not apply because, among other things, CEQA does not require a public notice of the type asserted by LADWP.

The issue of statutory construction raised by the parties' contentions is whether the public hearing held by County provided an "opportunity for members of the public to raise" the CEQA objections to County's reliance on the existing facilities exemption and

14.

commonsense exemption.  (§ 21177, subd. (e).)  Our Supreme Court addressed the meaning of this statutory text when it stated that the issue exhaustion requirement "applies to a public agency's decision that a proposed project is categorically exempt from CEQA compliance *as long as the public agency gives notice of the ground for its exemption determination*."  (*Tomlinson*, *supra*, 54 Cal.4th at p. 291, italics added.)  In other words, the requisite opportunity is not provided when the public "agency holds a hearing but does not provide *adequate* notice that a CEQA exemption will be considered."  (2 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act, *supra*, § 23.105, p. 23-122, italics added.)  We agree with the practice guide's conclusion that notice must be adequate.  Accordingly, we conclude the Supreme Court used the term "gives notice" to mean gives adequate notice.  (*Tomlinson*, *supra*, 54 Cal.4th at p. 291.)  A contrary interpretation that concludes the court meant "gives notice, whether adequate or not," is unreasonable.

Under the facts presented, we conclude County did not provide adequate notice that CEQA exemptions would be considered at the public meeting.  First, the agenda request form for the August 2017 hearing of County's Board of Supervisors did not mention CEQA or any exemption.  (See *Defend Our Waterfront*, *supra*, 240 Cal.App.4th at pp. 583–584 [meeting's agenda did not notify anyone the lead agency would consider a statutory exemption].)  Second, County's appellate briefing cites nothing in the administrative record showing the public was notified before the hearing of County's possible reliance on CEQA exemptions.  Thus, it appears the first disclosure or notice occurred just before the close of the public portion of the August 2017 hearing when a County staff member stated that County believed the proposed condemnation was exempt from CEQA under the existing facilities exemption and the commonsense exemption. We conclude as a matter of law that such a disclosure near the end of the hearing does not constitute adequate notice to the public that a CEQA exemption will be considered.

15.

Consequently, nothing in the administrative record establishes that County gave the notice necessary to provide an "opportunity for members of the public to raise … objections" to County's reliance on the two CEQA exemptions. (§ 21177, subd. (e).) As a result, the issue exhaustion requirement in section 21177, subdivision (a) does not apply to LADWP's challenges to County's reliance on those exemptions. The trial court correctly concluded it had jurisdiction to consider those challenges.

II.     THE CEQA PROJECT*

A.      Standards of Judicial Review

Judicial review of County's compliance with CEQA is governed by the abuse of discretion standard set forth in section 21168.5. Consequently, our "inquiry shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (§ 21168.5; see *Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 511.)

This statutory text identifies two ways an abuse of discretion can occur, each of which has its own standard of review. First, the public agency could fail to proceed in the manner required by CEQA, thereby committing procedural error. Whether the public agency has employed the correct procedures—that is, followed applicable law—is subject to independent judicial review. (*Sierra Club v. County of Fresno*, *supra*, 6 Cal.5th at p. 512.)

Second, the public agency could abuse its discretion by making findings of fact unsupported by substantial evidence. When the agency acts in its role as the finder of facts, its findings are subject to deferential review under the substantial evidence standard. (*Sierra Club v. County of Fresno*, *supra*, 6 Cal.5th at p. 512.)

---

\*       See footnote, *ante,* page 1.

B.    Overview of CEQA's Environmental Review Process

There are three stages of environmental review established by CEQA.  (*King & Gardiner Farms, LLC v. County of Kern* (2020) 45 Cal.App.5th 814, 885; see Guidelines, § 15002, subd. (k) [three-step process].)  In the first stage, the agency conducts a preliminary review to determine if the proposed activity is a CEQA project and, if so, whether it is exempt from CEQA.  (*King & Gardiner Farms*, *supra*, at p. 885.)  If the proposed activity is a project and is not exempt, the agency must proceed to the second stage.[4]  In contrast, if the agency determines the project is exempt, no further environmental analysis is required, and the agency may file a notice of exemption.  (Guidelines, § 15002, subd. (k)(1).)[5]

Here, County determined the condemnation proceedings were exempt from CEQA.  Therefore, we consider whether County properly completed the first stage of CEQA's environmental review process when it (1) described the project and (2) determined exemptions applied.

C.    Defining a Project and Its Scope

1.    *Definition of a CEQA Project*

CEQA applies to "discretionary projects proposed to be carried out or approved by public agencies."  (§ 21080, subd. (a).)  CEQA broadly defines a "project" as "an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and which is ... [¶] ... (a) [a]n

---

[4]    In the second stage, the agency completes an initial study and decides whether the environmental review can be concluded with the adoption of a negative declaration or, alternatively, whether the agency must proceed to the third stage and prepare an environmental impact report (EIR).  (*King & Gardiner Farms*, *supra*, 45 Cal.App.5th at p. 885.)

[5]    Public agencies are not required to file a notice of exemption, but a shorter statute of limitations applies if they do.  (See § 21167, subd. (d); Guidelines, § 15062, subd. (d) [filing a notice of exemption starts a 35-day limitations period; otherwise, a 180-day statute of limitations applies].)

activity directly undertaken by any public agency." (§ 21065.) An example of a project is the enactment or amendment of a zoning ordinance. (§ 21080, subd. (a).)

The statutory definition is augmented by the Guidelines, which state a "project" is "the whole of an action, which has a potential for resulting in either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment...." (Guidelines, § 15378, subd. (a).) The Guidelines provide examples of projects undertaken directly by a public agency, such as "public works construction and related activities clearing or grading of land, improvements to existing public structures, … and the adoption and amendment of local General Plans or elements thereof." (Guidelines, § 15378, subd. (a)(1).) "The term 'project' refers to the activity which is being approved and which may be subject to several discretionary approvals by governmental agencies. The term 'project' does not mean each separate governmental approval." (Guidelines, § 15378, subd. (c).)

### 2. *Timing of CEQA Review*

Our Supreme Court has endorsed the view that CEQA contemplates consideration of environmental consequences at the earliest possible stage, even though more detailed environmental review may be necessary later. (*Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection* (2008) 44 Cal.4th 459, 503.) Consistent with this view, CEQA's requirements cannot be avoided by chopping a large project with significant adverse consequences into many little ones—each with a minimal potential impact on the environment. (*Ibid.*; *Rio Vista Farm Bureau Center v. County of Solano* (1992) 5 Cal.App.4th 351, 370.) Piecemeal review is contrary to CEQA's requirements. In contrast, where future development is unspecified and uncertain, no purpose can be served by requiring an environmental review that engages in sheer speculation as to future environmental consequences. (*Environmental Protection Information Center*, *supra*, at p. 503.)

18.

### 3. *Issues of Law Presented*

The application of the foregoing definitions and principles requires a court to answer two basic questions. The court first must determine which activities constitute the whole of the action—that is, which activities are properly treated as part of the project and which activities are not. Once that question is resolved, the whole of the activity can be evaluated to determine whether it qualifies as a "project" for purposes of CEQA.

In *Tuolumne County Citizens for Responsible Growth, Inc. v. City of Sonora* (2007) 155 Cal.App.4th 1214 (*Tuolumne*), we stated that no published opinion had "addressed explicitly the question whether a determination of the scope of an activity is reviewed as either a question of law or a question of fact." (*Id.* at p. 1224.) We concluded "that the question concerning which acts constitute the 'whole of an action' for purposes of Guidelines section 15378 is a question of law that appellate courts independently decide based on the undisputed facts in the record." (*Ibid.*) Ten years later, we confirmed our "conclusion that the question of which acts make up the whole of the action constituting the CEQA project is a question of law (i.e., is not a discretionary determination) resolved without deference to the agency's determination." (*POET, LLC v. State Air Resources Bd.* (2017) 12 Cal.App.5th 52, 100 (*POET II*).)[6] "Whether two activities are parts of a single project is a question for our independent review." (*County of Ventura v. City of Moorpark* (2018) 24 Cal.App.5th 377, 385; see *Paulek v. Department of Water Resources* (2014) 231 Cal.App.4th 35, 46 ["Whether a project has received improper piecemeal review is a question of law that we review independently"].)

After the whole of the activity is identified, the question of whether the entire activity is a project for purposes of CEQA "is an issue of law that can be decided on

---

[6]     County's appellate briefs have not cited *Tuolumne* or *POET II* and, thus, have not argued the rule of law adopted in those decisions is wrong. County is aware of *Tuolumne* because trial court cited that decision in its tentative ruling from the bench.

19.

undisputed data in the record on appeal." (*Muzzy Ranch Co. v. Solano County Airport Land Use Com.* (2007) 41 Cal.4th 372, 382 (*Muzzy Ranch*).)

### D. Scope of This Project

#### 1. Contentions of the Parties

County contends it properly initiated condemnation of each landfill site "[a]nd it certainly did not need to conduct CEQA review of future changes that the County has not even proposed, such as the digging of new groundwater wells or the importing of waste from adjacent counties." County also contends "there is ample 'substantial evidence' in the record demonstrating that the County's mere acquisition of the Landfill Sites will not itself result in any environmental changes." These contentions imply that "the whole of [the] action" constituting the project is limited to the acquisition of the landfill sites through condemnation proceedings. (Guidelines, § 15378, subd. (a).)

LADWP contends County mischaracterized the project as a mere change in ownership and violated CEQA by omitting integral components and foreseeable consequences. LADWP argues County's "inaccurate Project description omits several integral parts, including critical information about: (1) the nature and extent of the Project; (2) the development of new groundwater rights; (3) the acquisition of property with existing and threatened soil and groundwater contamination; (4) the expansion of permitted daily tonnage and site capacity; (5) the import of waste; and (6) the remaining operational life of the Landfills."

#### 2. Trial Court's Decision

The trial court's tentative ruling stated County's description of the project as a mere transfer of property ownership impermissibly omitted reasonably foreseeable consequences of the project. The court concluded those consequences were (1) the development and use of groundwater below the three landfills; (2) the importation of waste from other counties; and (3) an increase in the tonnage of waste deposited in the

landfills. In addition, the court determined "the record is ambiguous with contradictory evidence as to the estimated closing dates or operational life of the landfills without any explanation for these discrepancies." The court stated the estimated closure dates were important to the landfill's life span, which directly affected the nature and scope of the project. As a result, the court found County's "description with regard to the life expectancy or estimated closing date is fundamentally inadequate and misleading."

### 3. Water Rights

The first subject we consider is water, which includes its source and use. The resolutions of necessity stated County's intent "to continue the use and operation of a landfill … and, in connection therewith, acquire interests in" the three landfill sites. The interest "to be acquired consists of a fee interest in the" landfill sites. This reference to a "fee interest" plainly establishes that County intends to acquire ownership of the land and the appurtenant water rights.

At the August 2017 public hearing, Assistant County Administrator Rick Benson stated that "to run a landfill, we need water, and the lease has terms in it where we – [the] value of the water is in there, but we do not have a water source that we can rely on in order to be able to provide for the operation of the landfill and you cannot operate a landfill without water." Because the project includes the continued use and operation of the landfills, it logically follows that the whole of the action includes obtaining the water necessary to run the landfills. (See *RiverWatch v. Olivehain Municipal Water Dist.* (2009) 170 Cal.App.4th 1186, 1204 ["the activity of trucking recycled water … to the Landfill site is *part of the whole action* or operations of the landfill project for purposes of CEQA"].) County, which treated the project as a mere change in title to the land, did not identify the source of the water for the continued operation of the landfills.

County's omission of the sources of water for its continued operation of the landfills is significant in this case because the Bishop-Sunland Landfill (the largest of the

three landfills) obtained water from domestic well D-126, which is located on a LADWP parcel adjacent to the landfill site. County's current access to that well is governed by the lease with LADWP. Whether domestic well D-126 will remain available to County after the condemnation proceedings are completed and the lease is terminated is uncertain. At the August 2017 hearing, Richard Harasick, Senior Assistant General Manager of Water for LADWP, referred to an offer made by LADWP for the sale of the landfill sites which included LADWP providing "a reliable source of water in sufficient quantity" for the landfills. The terms of the offer, which were not accepted by County, do not demonstrate that LADWP will reach an agreement with County to continue to provide water from domestic well D-126 in the event the condemnation proceedings are completed. In other words, it is reasonably foreseeable that County will need to obtain water from a different source once it becomes the owner of the parcel containing the Bishop-Sunland Landfill.[7]

To define the scope of the CEQA project at this stage of the environmental review process (i.e., the preliminary review or first stage), we only need identify the activities that constitute "the whole of [the] action" (Guidelines, § 15378, subd. (a)) and then determine whether County included those activities in its project description. The fact that County's water source for the continued operation of the Bishop-Sunland Landfill has not been identified does not mean the need to secure a water source is not part of the project. Securing a water source is integral to the project because, as stated by Benson, a landfill cannot be operated without water. (See *Tuolumne*, *supra*, 155 Cal.App.4th at p. 1229 ["when one activity is an integral part of another activity, the combined activities are within the scope of the same CEQA project"].) As a result, the continued operation

---

**7** While it is reasonably foreseeable that County and LADWP might reach an agreement that allows County to obtain water from LADWP's existing well, it also is reasonably foreseeable that County might (1) develop the groundwater rights acquired in the condemnation proceeding and drill a well on the parcel containing the Bishop-Sunland Landfill or (2) use an alternate source or sources.

of the Bishop-Sunland Landfill "is dependent upon, not independent of," securing a water source. (*Id*. at p. 1231.) Consequently, we reach the legal conclusion that the activities constituting the project include securing a water source for the Bishop-Sunland Landfill.

Next, we consider whether it was reasonably foreseeable that County might develop the rights to groundwater it proposes acquiring in connection with the other landfills. The possibility of condemning the land without the water rights was raised at the August 2017 public hearing. Despite this less expensive course of action, the Board of Supervisors chose to authorize the condemnation of a fee interest in those sites. Item 4.c. in each of the three resolutions stated: "The property sought to be acquired is necessary for the Project." Item 4.e. of each resolution stated that "the acquisition *and use* of such property by the County for the purposes identified herein is for a more necessary public use than the use to which the property has already been appropriated." (Italics added.) The Board of Supervisor's decision to include the water rights in the property to be condemned and the wording of the resolutions indicates that the water rights are necessary and will be used. Furthermore, the decision to include the water rights, when considered in light of the surrounding circumstances, establishes the development of the water rights being acquired is reasonably foreseeable.

It is plain from the record that County did not include securing a source of water for the continued operation of the Bishop-Sunland Landfill in its description of the project and did not include the development of the groundwater rights at the other sites. Therefore, County failed to proceed in the manner required by CEQA when it described the project. Specifically, County did not include "the whole of [the] action" (Guidelines, § 15378, subd. (a)) in its description. The legal (i.e., procedural) error of adopting an inappropriately narrow view of the project constitutes an abuse of discretion for purposes of section 21168.5.

23.

### 4.      Importing Waste

The second subject we consider is the possibility that County would allow solid waste from neighboring counties to be deposited in the landfills once it acquires ownership of the sites through eminent domain. Section 10 of the lease for the Bishop-Sunland Landfill provides that County "shall not import waste originating outside Inyo County without Lessor's prior written consent." The agenda request form for the August 2017 public hearing addressed this lease provision by stating: "The terms of the current Bishop-Sunland lease also thwart[] any potential cooperative efforts with neighboring counties or municipalities as it prohibits the acceptance of any waste from outside of Inyo County including Mono County or Mammoth Lakes." This subject also was addressed by Benson at the public hearing when he stated:

> "Another term of the lease is that we would be prohibited from taking any other county's waste. Now, we are not and nor have we ever been interested in becoming a waste disposal center for the State of California, but what this does is it thwarts our ability to work with our neighbors, to work with Mono County or with Mammoth Lakes on possibly -- if something makes sense and it might be to everyone's advantage -- to have waste come to our landfill. We're precluded from even going there per the terms of the lease."

Based on the agenda request form and Benson's statements at the public hearing, a reasonably foreseeable consequence of County successfully condemning the landfills is an expansion of those operations to include the acceptance of solid waste from sources outside Inyo County. Because County did not include this reasonably foreseeable activity in its description of the project, its description did not include "the whole of [the] action." (Guidelines, § 15378, subd. (a).) As a result, County failed to proceed in the manner required by CEQA and this legal (i.e., procedural) error constitutes a further abuse of discretion for purposes of section 21168.5.

24.

E.    Summary

County failed to comply with CEQA when it described the proposed project as simply a change in ownership or the mere acquisition of the landfill sites.  County's errors in describing the proposed project tainted its reliance on the exemptions claimed, our next subject.

III.   CEQA EXEMPTIONS

County relies on the categorical exemption for existing facilities (Guidelines, § 15301) and the commonsense exemption (Guidelines, § 15061, subd. (b)(3)).  CEQA's categorical exemptions are set forth in sections 15301 to 15333 of the Guidelines.  Categorical exemptions are authorized by section 21084, subdivision (a), which states:

> "The guidelines prepared and adopted pursuant to Section 21083 shall include a list of classes of projects that have been determined not to have a significant effect on the environment and that shall be exempt from this division.  In adopting the guidelines, the Secretary of the Natural Resources Agency shall make a finding that the listed classes of projects referred to in this section do not have a significant effect on the environment."

When a lead agency determines that a project is exempt from CEQA, that determination is subject to judicial review under the standards contained in section 21168.5 and described in part I.B. of this opinion.  The application of these standards to an exemption determination was discussed in *Berkeley Hillside Preservation v. City of Berkeley* (2015) 60 Cal.4th 1086 (*Hillside*).  There, the project proponents wanted to build a large house and 10-car garage on their steeply sloping lot.  (*Id.* at p. 1093.)  The city council affirmed the zoning board's approval of a use permit for the project.  A notice of exemption was filed, stating the project was categorically exempt under two Guideline provisions and the unusual circumstances exception in Guidelines section 15300.2 did not apply.  (*Hillside*, *supra*, at p. 1096.)  The Supreme Court identified two potential abuses of discretion, stating that "reversal of the City's action here is appropriate only if (a) the City, in finding the proposed project categorically exempt, did

25.

not proceed in the manner required by law, or (b) substantial evidence fails to support that finding." (*Id.* at p. 1110.)

In accordance with *Hillside*, we independently review whether County proceeded in the manner required by law in making its exemption determination and apply the substantial evidence test to the County's findings of fact. Stated from another perspective, an appellate court "must first determine as a matter of law the scope of the exemption and then determine if substantial evidence supports the agency's factual finding that the project fell within the exemption." (*California Farm Bureau Federation v. California Wildlife Conservation Bd.* (2006) 143 Cal.App.4th 173, 185.) This appeal raises a legal question about the scope of the existing facilities exemption, which requires us to interpret the words used in Guidelines section 15301.

A. <u>Existing Facilities</u>

1. *Regulatory Text*

The existing facilities exemption is designated "Class 1" and covers "the operation, repair, maintenance, permitting, leasing, licensing, or minor alteration of existing public or private structures, facilities, mechanical equipment, or topographical features, involving negligible or no expansion of existing or former use." (Guidelines, § 15301.) "The key consideration is whether the project involves negligible or no expansion of use." (Guidelines, § 15301; see *Communities for a Better Environment v. South Coast Air Quality Management Dist.* (2010) 48 Cal.4th 310, 326 ["the continued operation of an existing facility without significant expansion of use … [is] exempt from CEQA review under CEQA Guidelines section 15301"].)

2. *Dispute Over the Meaning of the Term "Facilities"*

The parties offer different interpretations of Guidelines section 15301's term "facilities." LADWP argues the term excludes unlined landfills and, therefore, the existing facilities exemption does not apply to County's project. As support, LADWP

relies on the interpretation adopted by the court in *Azusa*, *supra*, 52 Cal.App.4th 1165. In that case, the Second District concluded "[t]he categorical exemption for an existing facility should not be construed to include a large, municipal waste landfill." (*Id.* at p. 1192, italics omitted.) In contrast, County argues the existing facilities exemption applies and asserts LADWP made "no effort to address the facts in *Azusa*, which are strikingly different from this case."

### 3. The Term "Facilities" Is Ambiguous

The Guidelines are administrative regulations and, as a general rule, are subject to the same rules of interpretation as statutes. (*Hillside*, *supra*, 60 Cal.4th at p. 1097 [rules governing interpretation of statute also govern interpretation of Guidelines].) Accordingly, the first step in analyzing the meaning of a provision in the Guidelines is determining whether the language used is ambiguous. (*Gutierrez v. Carmax Auto Superstores California* (2018) 19 Cal.App.5th 1234, 1249 (*Gutierrez*) [first question of statutory interpretation is whether the statute's language is ambiguous].) "Ambiguous" means reasonably susceptible to more than one meaning. (See *Estate of Newmark* (1977) 67 Cal.App.3d 350, 355 ["ambiguity exists in a written instrument when its language is properly susceptible to multiple constructions"].) This threshold inquiry into ambiguity also is made when construing contracts and other written instruments. (E.g., *Smith v. Adventist Health System/West* (2010) 182 Cal.App.4th 729, 754–755 [court's threshold question when interpreting a contract is whether the writing is ambiguous].)

In *Azusa*, the Second District explicitly addressed this threshold question and concluded: "The language of the exemption for an existing 'facility' is ambiguous with respect to its application to a solid waste landfill." (*Azusa*, *supra*, 52 Cal.App.4th at p. 1192.) The court noted the Guidelines did not define the term and then considered two dictionary definitions of "facility"—one of which stated a facility is something " 'built or installed to perform some particular function.' " (*Id*. at p. 1193.) The court stated: "A

27.

landfill, however, is excavated, and a 'facility' is not necessarily inclusive of a landfill." (*Ibid.*)

County's appellate briefing does not address the threshold question of whether the term "facilities" used in Guidelines section 15301 is ambiguous. However, an amicus curiae brief asserts "that much of *Azusa*'s analysis on this point has not aged well—and some was not well taken even in 1997." The brief argues modern landfills are not merely excavated pits but include many structures built or installed such as gate houses, scales, tipping floors, gas recovery systems, and administrative buildings. The brief also asserts that whatever ambiguities the term "facility" may have in some contexts, this is not one of them because landfills are routinely referred to as facilities in both common and technical usage. This assertion is supported by cites to statutes, judicial opinions and other Guideline provisions that refer to landfills as facilities. (See §§ 40194, 40195.1; *County of San Diego v. Ace Property & Casualty Ins. Co.* (2005) 37 Cal.4th 406, 411; Guidelines, §§ 15186, subd. (c)(1)(A) & 15282, subd. (q).) In response to the amicus curiae brief, LADWP glosses over the threshold question of ambiguity and argues "neither the *Azusa* court nor the Trial Court adopted a blanket interpretation of the exemption."

In deciding whether the term "facilities" is ambiguous, we do not look at that word in isolation, but consider it in the context of the statutory and regulatory scheme as a whole. (*Coalition of Concerned Communities, Inc. v. City of Los Angeles* (2004) 34 Cal.4th 733, 737.) The 32 other categorical exemptions provide part of that context. Class 2 covers certain replacements or reconstructions of existing structures or facilities. (Guidelines, § 15302.) Class 4 covers "minor public or private alterations in the condition of land." (Guidelines, § 15304.) Class 13 covers "the acquisition of lands for fish and wildlife conservation purposes." (Guidelines, § 15313.) Class 16 covers certain acquisitions or transfers of land to establish a park. (Guidelines, § 15316.) Class 25 covers certain transfers of ownership of interests in land to preserve open space, habitat

or historical resources. (Guidelines, § 15325.) Class 33 covers projects not exceeding five acres that "assure the maintenance, restoration, enhancement, or protection of habitat for fish, plants or wildlife" where certain conditions are met. (Guidelines, § 15333.)

One way to interpret these categorical exemptions is to start with the idea that the classes tend to be mutually exclusive and, therefore, if an activity is potentially covered by one exemption it probably falls outside the coverage of the other exemptions.[8] For example, the operation of a facility and an alteration in the condition of land are probably different things. Here, we consider whether a landfill is best described (1) by the term "facilities," (2) by the phrase "alteration[] in the condition of land" that is contained in the Class 4 exemption for minor alterations in the condition of land, or (3) as including some components that are facilities and some components that are alterations in the condition of land. (Guidelines, §§ 15301, 15304.) If some or all of operation of a landfill can be logically described as an alteration in the condition of land, it increases the probability that the operation (or a portion of the operation) it is not properly described as the operation of a facility.

Our evaluation of whether the operation (or a portion of the operation) of a landfill might be reasonably described as an "alteration[] in the condition of land" includes an examination of the examples provided in Guidelines section 15304. Excluding the modifiers that render them "minor," the examples include "[g]rading on land," "[f]illing of earth into previously excavated land," and "trenching and backfilling." (Guidelines, § 15304, subds. (a), (c), (f).)[9] We conclude, based on the plain meaning of the phrase

---

[8]    Our examination of the threshold question of ambiguity considers possibilities and probabilities because that question is answered by identifying interpretations to which the term "facilities" is reasonably susceptible. (See *Gutierrez*, *supra*, 19 Cal.App.5th at p. 1249.)

[9]    Landfill operations do not qualify for the exemption because the alterations to the land are not "minor." For instance, to be minor, the "[f]illing of earth into previously

"alteration[] in the condition of land" and these examples, that it is reasonable to treat landfill operations as including activity that is more accurately characterized as altering the condition of land rather than as consisting only of the operation of facilities. For instance, the term "facilities" could be viewed as including many of the structures at a landfill, such as gate houses, scales, tipping floors, gas recovery systems, and administrative buildings, but excluding the pit holding the alternating layers of solid waste and dirt, which is an alteration in the condition of land.

Accordingly, we cannot conclude that the entirety of the operation of a landfill *unambiguously* qualifies as the operation of facilities for purposes of Guidelines section 15301. Instead, we conclude it is reasonable to characterize landfill operations as involving an alteration in the condition of land rather than exclusively as the operation of a facility or facilities. Therefore, the term "facilities" is reasonably susceptible to multiple interpretations with respect to its application to a landfill. Consequently, we resolve the threshold question by concluding the term "facilities" is ambiguous. (*Azusa*, *supra*, 52 Cal.App.4th at p. 1192 [same].)

### 4. Resolving the Ambiguity

Having decided the term is ambiguous in its application to landfills, the next step is to resolve that ambiguity. Generally, a court's primary goal when construing a statute or regulation is to adopt the interpretation that best effectuates the legislative and regulatory intent or purpose. (See *Gutierrez*, *supra*, 19 Cal.App.5th at p. 1250.) To identify the best interpretation, courts consider information from a variety of sources. (*Ibid*.) The most obvious source to be considered when interpreting language in a categorical exemption is the provision in CEQA that authorized the creation of categorical exemptions. (*Azusa*, *supra*, 52 Cal.App.4th at p. 1192 [exemption should be

---

excavated land" must use "material compatible with the natural features of the site." (Guidelines, § 15304, subd. (c).)

30.

construed in light of statutory authorization].)  Based on this statutory foundation, the term "facilities" should not be broadly interpreted "to include a class of businesses that will not normally satisfy the statutory requirements for a categorical exemption, even if the premises on which such businesses are conducted might otherwise come within the vague concept of a " 'facility.' "  (*Id.* at pp. 1192–1193.)  Instead, a categorical exemption should be interpreted narrowly to afford the fullest possible protection to the environment within the reasonable scope of the statutory language.  (*Save Our Carmel River v. Monterey Peninsula Water Management Dist.* (2006) 141 Cal.App.4th 677, 697; see Guidelines, § 15003, subd. (f).)

The statutory language authorizes categorical exemptions for "classes of projects that have been determined not to have a significant effect on the environment" and states "the Secretary of the Natural Resources Agency shall make a finding that the listed classes of projects referred to in this section do not have a significant effect on the environment."  (§ 21084, subd. (a).)  Nothing in the record before this court shows the Secretary made an *explicit* finding, one way or the other, about whether landfills fit into the class of existing facilities that should be exempt from CEQA.

The record does contain materials that support inferences about the Secretary's view of whether the existing facilities exemption includes landfills.  Those materials relate to the 1998 revisions to the Guidelines—including amendments to Guidelines section 15301—and we have taken judicial notice of them.  A September 22, 1997 memorandum from Maureen F. Gorsen and Steve Greene to Douglas P. Wheeler, the Secretary of the Natural Resources Agency from 1991 to 1999, and Jim Branham stated documents were attached to "facilitate your decision-making on all aspects of the proposed 1997-98 CEQA Guidelines revisions."  Section 6 of the third attachment described the content of the proposed revisions to the categorical exemptions.  The description of the changes to Guidelines section 15301 stated in full:

31.

"Section 15301 - Adds permitting and licensing of existing facilities; clarifies the baseline for application of the exemption (at time of agency's determination); attempts to deal with the misreading of this section by the court in the <u>Azusa Land Reclamation Co.</u> case by clarifying that the list of potential types of Class 1 projects is not all-inclusive; adds 'use of a single-family residence as a small family day care home' as an additional Class 1 example."

The reference to *Azusa* is the only mention of that case in the materials related to the 1998 revisions to the Guidelines. The reference is significant because it shows Secretary Wheeler and his staff were aware of *Azusa*. It also shows staff thought the *Azusa* court had misread one specific aspect of Guidelines section 15301 and supports the inference that staff did not think the *Azusa* court's conclusions that the term "facilities" was ambiguous and did not include landfills, warranted criticism or a clarifying amendment. As a result of the reference to *Azusa* and the fact the revisions to Guidelines section 15301 adopted by the Secretary did not address landfills, we conclude neither staff nor the Secretary disagreed with the *Azusa* court's conclusion that the term "facilities" excluded landfills. (See *Azusa*, *supra*, 52 Cal.App.4th at p. 1192.)

In *Azusa*, the court's analysis of landfills as a class included a reference to the 1989 legislative fining that "[o]ver 90 percent of California's solid waste currently is disposed of in landfills, some of which pose a threat to groundwater, air quality and public health." (§ 40000, subd. (b).) Based on this finding, the court concluded "that landfills do not constitute a suitable class of properties for a categorical exemption, and the Class 1 exemption for the operation and minor alteration of existing facilities should therefore not be construed to include such landfills." (*Azusa*, *supra*, 52 Cal.App.4th at p. 1195.)

We agree that the legislative finding that *some* landfills pose a threat to groundwater, air quality and public health justifies the conclusions that unlined landfills do not constitute a suitable *class* for a categorical exemption. Consequently, in view of the basic principle that categorical exemptions should be interpreted narrowly to afford

32.

the fullest possible protection to the environment within the reasonable scope of the statutory language, we conclude the ambiguous term "facilities" should be interpreted to exclude unlined landfills.[10] This construction of Guidelines section 15301 leads to the conclusion that the three landfills in question do not fall within the scope of the categorical exemption for existing facilities. Therefore, County proceeded in a manner contrary to law when it concluded that exemption applied to the project.

      B.      <u>Unusual Circumstances Exception</u>[*]

The trial court's decision was thorough and considered whether the unusual circumstances exception precluded County from relying on a categorical exemption. The trial court determined "there is substantial evidence that supports finding a reasonable possibility that the project will result in a significant environmental impact." County contends it clearly determined, in its role as lead agency, that the "mere acquisition of the Landfill Sites did not raise any unusual circumstances" because County was already occupying and using those sites and the only change was County becoming an owner instead of a tenant.

Guidelines section 15300.2, subdivision (c) states: "A categorical exemption shall not be used for an activity where there is a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances." When a project meets "the requirements of a categorical exemption, a party challenging the exemption has the burden of producing evidence supporting an exception." (*Hillside*, *supra*, 60 Cal.4th at p. 1105.) There are two ways a party, such as LADWP, may establish the unusual circumstances exception applies. First, the party may show that "the project has some feature that distinguishes it from others in the exempt class, such as

---

**10**    Based on the facts of this case and those in *Azusa*, which also involved an unlined landfill, we need not address the broader question of whether the term "facilities" also excludes lined landfills.

[*]    See footnote, *ante,* page 1.

its size or location.  In such a case, to render the exception applicable, the party need only show a reasonable possibility of a significant effect due to that unusual circumstance." (*Ibid*.)  Second, "a party may establish an unusual circumstance with evidence that the project will have a significant environmental effect.  That evidence, if convincing, necessarily also establishes 'a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances.'  (Guidelines, § 15300.2, subd. (c).)"  (*Hillside*, *supra*, 60 Cal.4th at p. 1105.)

Here, we do not reach the question of whether the unusual circumstances exception prevents County from relying on the existing facilities exemption because we have determined that exemption does not apply to this project.  (Cf. *Azusa*, *supra*, 52 Cal.App.4th at p. 1207 [concluding 80-acre unlined landfill was 'unusual' because it overlay a major drinking water aquifer and presented a substantial risk of pollution].)  In addition, County's erroneous description of the project caused the administration record to be undeveloped on the application of the exception to the exemption.  For instance, LADWP did not have adequate notice of County's reliance on the exemption and, therefore, did not have a fair opportunity to address "the burden of producing evidence supporting an exception."  (*Hillside*, *supra*, 60 Cal.4th at p. 1105.)

C.    Commonsense Exemption[*]

1.    *Basic Principles*

County also relied on the commonsense exemption, which is inherent in CEQA's text and explicitly set forth in Guidelines section 15061 as follows:

> "(b) A project is exempt from CEQA if: [¶] … [¶] (3)  The activity is covered by the common sense exemption that CEQA applies only to projects which have the potential for causing a significant effect on the environment.  Where it can be seen with certainty that there is no possibility that the activity in question may have a significant effect on the environment, the activity is not subject to CEQA."

---

[*]    See footnote, *ante,* page 1.

"[W]hether a particular activity qualifies for the commonsense exemption presents an issue of fact, and … the agency invoking the exemption has the burden of demonstrating it applies." (*Muzzy Ranch, supra,* 41 Cal.4th at p. 386.) Accordingly, when a legitimate question is raised about the possible environmental impacts of a proposed activity, the public agency has "the burden to elucidate the facts that justified its invocation of CEQA's commonsense exemption." (*Muzzy Ranch*, *supra*, at p. 387.) Despite this allocation of the burden of presenting evidence and demonstrating the exemption applies, it is possible for an agency to carry that burden on appeal even though the commonsense exemption was not addressed in the agency's review. (See *Save the Plastic Bag Coalition v. City of Manhattan Beach* (2011) 52 Cal.4th 155, 175.)

### 2. Contentions

County's opening brief asserts "there is ample 'substantial evidence' in the record demonstrating that the County's mere acquisition of the Landfill Sites will not itself result in any environmental changes." This contention relies on County's erroneous description of the project and, as a result, the contention is tainted with legal error. (See pt. II.D., *ante* [Scope of This Project].) County also asserts "the record includes a *lack of evidence* of any potential environmental changes that will result from the mere change in ownership—under these circumstances, the lack of evidence of actual impacts is, by itself, substantial evidence that there will be no impacts." Again, this contention is tainted by County's legal error in viewing the project too narrowly—an error that can be described as piecemealing. (See *Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection*, *supra*, 44 Cal.4th at p. 503 ["CEQA cannot be avoided by piecemeal review"].)

County also addresses the trial court's analysis and argues "the trial court should have deferred to the County's factual determination that the substantial evidence in the record supported its determination that the acquisition fell within the definition of the

common sense exemption." County supports this argument by asserting the resolutions of necessity "do not authorize any landfill activity beyond what currently exists. … The project here only constitutes 'changing a tenant to an owner,' and nothing more."

### 3. *Independent Review of an Undeveloped Record*

Our analysis of County's arguments begins with the principle that, in a CEQA case, both the trial court and appellate court sit as a court of review. (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 427.) As a result, the appellate court reviews the agency's action, not the trial court's decision. (*Ibid.*) Therefore, we do not evaluate the trial court's analysis for error. Instead, we conduct an independent review of County's action, which leads us to conclude County's approach to the commonsense exemption was tainted by its legal error. We recognize "whether a particular activity qualifies for the commonsense exemption presents an issue of fact." (*Muzzy Ranch*, *supra*, 41 Cal.4th at p. 386.) However, because County took an erroneous view of the activities constituting the project, we cannot infer the Board of Supervisors decided the pertinent issues of fact raised by the application of the commonsense exemption to those activities. Furthermore, we cannot decide the issues of fact as a matter of law because the evidence in the administrative record is insufficient to carry County's burden of "elucidat[ing] the facts that justified its invocation of CEQA's commonsense exemption." (*Id.* at p. 387.) For example, there is insufficient evidence to identify the source of water for the Bishop-Sunland Landfill and evaluate the environmental consequences of using that source.

Therefore, we conclude County failed to proceed in the manner required by CEQA when it invoked the commonsense exemption. Whether the commonsense exemption might apply to the whole of the projects' activity is a question that we cannot definitively resolve because the administrative record was never developed to address the whole of the project's activity.

## IV.    TERMS OF THE WRIT OF MANDATE

County contends the writ of mandate issued by the trial court was too expansive, erroneously ordering County to vacate all three resolutions of necessity.  County asserts "the present action challenges three *separate* resolutions of necessity for three *separate* parcels.  Each must be considered independently."  County's piecemeal approach is contrary to long-established CEQA principles, which includes the Guidelines' definition of a "project" as "the whole of an action."  (Guidelines, § 15378, subd. (a); see *Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection* (2008) 44 Cal.4th 459, 503 ["CEQA cannot be avoided by piecemeal review"].)  We therefore conclude the trial court did not err in issuing a writ of mandate that (1) directed County to set aside the three resolutions of necessity and (2) stated the resolutions were null and void because County failed to comply with CEQA.  Furthermore, our independent review of the writ of mandate has identified no violation of section 21168.9, which addresses the requirements for the order entered after a court has determined the agency has failed to comply with CEQA.

## DISPOSITION

The judgment is affirmed.  Respondent shall recover its costs on appeal.


FRANSON, J.

WE CONCUR:


HILL, P.J.


SMITH, J.